```
              FILED          RECEIVED
              ENTERED        SERVED ON
                             COUNSEL/PARTIES OF RECORD

              JUL 2 2 2013

              CLERK US DISTRICT COURT
              DISTRICT OF NEVADA
         BY: _____ DEPUTY
```

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

MARLO THOMAS,            )
                         )   3:11-cv-00664-LRH-VPC
         Plaintiff,      )
                         )
    v.                   )   **REPORT AND RECOMMENDATION**
                         )   **OF U.S. MAGISTRATE JUDGE**
E.K. MCDANIEL, *et al.*, )
                         )
         Defendants.     )   July 22, 2013
                         )

This Report and Recommendation is made to the Honorable Larry R. Hicks, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4. Before the court is plaintiff's motion for summary judgment (#36).[1] Defendants opposed (#45) and plaintiff replied (#49). The court has thoroughly reviewed the record and recommends that plaintiff's motion for summary judgment (#36) be denied.

## I. HISTORY & PROCEDURAL BACKGROUND

Plaintiff Marlo Thomas ("plaintiff"), a *pro se* inmate, is currently incarcerated at Ely State Prison ("ESP") in the custody of the Nevada Department of Corrections ("NDOC") (#14). Plaintiff brings his amended civil rights complaint pursuant to 42 U.S.C. § 1983, alleging violations of his First and Fourteenth Amendment rights by former ESP Warden E.K. McDaniel, former ESP Associate Warden Renee Baker and former ESP Associate Warden Debra Brooks. *Id.* The court screened the amended complaint pursuant to 28 U.S.C. § 1915A, and permitted the following claims to proceed: (1) Fourteenth Amendment due process claim against all defendants; (2) First

---

[1] Refers to the court's docket numbers.

Amendment retaliation claim against all defendants; (3) First Amendment free exercise claim against defendants McDaniel and Baker; and (4) Fourteenth Amendment equal protection claim against all defendants (#18, p. 4).

Plaintiff alleges that on August 10, 2010, he was placed in administrative segregation ("ad-seg") without a proper classification hearing (#14, p. 4; #36, p. 7). In November and December 2010, plaintiff submitted numerous inmate kites requesting a full classification committee ("FCC") hearing (#36, Exs. 2-6). Defendants McDaniel and Baker refused to hold an FCC hearing until after the holidays. *Id.* On February 4, 2011, plaintiff attended what he presumed would be an FCC hearing (#14, p. 5; #36, pp. 4-5, 9). However, when plaintiff arrived at the hearing, defendant Baker informed him that the hearing was postponed because the warden was unavailable. *Id.* Plaintiff objected and told defendant Baker that he wished to be released from ad-seg so that he could practice his faith with other inmates in the unit (#14, pp. 5-6; #36, p. 5, 10, 14-15). Defendant Baker replied, "not on my watch." *Id.* Plaintiff asked defendant Baker if she held a "personal grudge" against him for being a Muslim inmate. *Id.* Defendant Baker refused to answer the question. *Id.* Instead, she told plaintiff that if he did not agree with her decision, he could contact defendant Brooks. *Id.*

Plaintiff alleges that on February 28, 2011, he sent an inmate kite to defendant Brooks asking her if she was aware that defendants McDaniel and Baker held a "personal grudge" against him because he is a Muslim inmate, and asking her if this "personal grudge" was the reason these defendants had denied his cross-over privileges (#14, pp. 5-6; #36, p. 5; #36, Ex. 14). Defendant Brooks allegedly responded, "Yes." *Id.* Thereafter, defendant McDaniel refused to meet with plaintiff for a classification review (#36, pp. 11, 17).

Plaintiff asks the court to grant summary judgment in his favor as to all claims, and argues that no reasonable jury could find in defendants' favor. Plaintiff contends that defendants McDaniel and Baker held a "personal religious grudge" against him because he is a Muslim inmate. Plaintiff asserts that when he insisted on participating in Islamic group worship, defendants retaliated against him by postponing his FCC hearing and continuing to hold him in ad-seg (#36, pp. 1-2). Plaintiff alleges that he remained in ad-seg for over a year without appearing before the FCC review board (#14, p. 4), and that defendants never explained why they continue to hold him in ad-seg (#36, pp. 6, 12).

Defendants allege that plaintiff is a "death row" inmate housed in the Condemned Men's Unit ("CMU") at ESP (#45-1, Ex. A, ¶ 11). The CMU is divided into Unit 3A and 3B. *Id.* Unit 3A houses "death row" inmates that have "open tier" privileges—meaning that these inmates can leave their cells in groups. *Id.* at ¶ 12. Unit 3B houses overflow "death row" inmates who may obtain cross-over privileges into Unit 3A where they may participate in "open tier." *Id.* Unit 3B is also designated as an administrative segregation unit. *Id.* at ¶ 13. Plaintiff was housed in Unit 3B, cell #31 from March 9, 2007, until October 13, 2012.[2] *Id.* at ¶ 11.

On February 13, 2010, plaintiff pled guilty to an infraction of NDOC's penal code and was sanctioned to 270 days in disciplinary segregation (#45-1, Ex. A, ¶ 15; #45-1, Ex. A-1, pp. 12-15). At the time, ESP did not have a specific disciplinary segregation unit available for plaintiff, so he served his disciplinary segregation in his same cell (#45-1, Ex. A, ¶ 16). Plaintiff experienced certain property restrictions, visitation restrictions, personal care restrictions and recreation restrictions as a result of this disciplinary segregation. *Id.* at ¶¶ 16-17.

---

[2] Prior to 2007, plaintiff was classified as a High Risk Potential ("HRP") inmate due to his extensive NDOC disciplinary history—including several staff assaults (#46, Ex. B, ¶¶ 6-7 (*sealed*)).

When an inmate completes disciplinary segregation, he may be classified in ad-seg (#45-1, Ex. A, ¶ 18; #45-1, Ex. A-9, p. 63). Inmates in ad-seg have similar property restrictions as inmates in disciplinary segregation (#45-1, Ex. A, ¶ 21). However, inmates in ad-seg may possess appliances and enjoy additional canteen, visitation and telephone privileges. *Id.* On August 11, 2010, plaintiff completed his disciplinary segregation and defendant Baker ordered that plaintiff's authorized property be returned to him (#45-1, Ex. A, ¶ 19; #45-1, Ex. A-2, p. 17). Thereafter, plaintiff was classified in ad-seg.

In September 2010, plaintiff began to submit inmate kites requesting cross-over privileges into Unit 3A, and generally challenging his ad-seg classification (#45-1, Ex. A, ¶ 22; #45-1, Ex. A-3). From September 2010 through December 2010, prison officials informed plaintiff that he was appropriately housed, that the classification team was reviewing his file, and that he would be scheduled for an FCC hearing after the holidays. *Id.* On February 16, 2011, March 16, 2011, April 21, 2011, and May 18, 2011, plaintiff was scheduled for regular ad-seg reviews (#45-1, Ex. A, ¶ 24; #45-1, Ex. A-4, p. 25). However, plaintiff declined to participate in these reviews. *Id.* On May 20, 2011, plaintiff appeared for an FCC hearing. Prison officials advised plaintiff that he would not be granted cross-over privileges into Unit 3A due to his past disciplinary history, his removal from HRP status in 2007, and his most recent disciplinary action in 2010. *Id.* at ¶ 25.

Defendants oppose plaintiff's motion for summary judgment on three grounds: (1) plaintiff has not established a protected liberty interest in his ad-seg classification; (2) plaintiff has received due process in his continued ad-seg classification (#45, p. 7); and (3) there are material issues of fact related to plaintiff's First Amendment claims and Fourteenth Amendment equal protection claim, which preclude a grant of summary judgment in plaintiff's favor (#45, pp. 9-11).

As a preliminary matter, the court notes that plaintiff is proceeding *pro se*. "In civil cases where the plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt." *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

## II. DISCUSSION & ANALYSIS

### A. Legal Standards

#### 1. 42 U.S.C. § 1983

Title 42 U.S.C. § 1983 "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999). Section 1983 does not offer any substantive rights, but provides procedural protections for federal rights granted elsewhere. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). To prove liability under § 1983, a plaintiff must: (1) show that a person acting under color of state law engaged in some type of conduct, which (2) deprived the plaintiff of some right, privilege or immunity secured by the Constitution or federal statutory law. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overturned on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).

#### 2. Summary Judgment Standard

Summary judgment allows courts to avoid unnecessary trials where there are no factual disputes. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). The court will grant summary judgment if no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). However, the Supreme Court has noted:

> [W]e must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citations omitted). Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and submitting authenticated evidence to demonstrate the absence of any genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see Orr v. Bank of America*, 285 F.3d 764, 773-74 (9th Cir. 2002). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial. *Anderson*, 477 U.S. at 248. Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and upon which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

On summary judgment the court is not to weigh the evidence or determine the truth of the matters asserted, but must only determine whether there is a genuine issue of material fact that must be resolved by trial. *See Summers v. A. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997). Nonetheless, in order for any factual dispute to be genuine, there must be enough doubt for a reasonable trier of fact to find for the plaintiff in order to defeat a defendant's summary judgment motion. *See Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

**B.     Analysis**

   **1.  Fourteenth Amendment Due Process**

Under the Due Process Clause of the Fourteenth Amendment, "[p]risoners . . . may not be deprived of life, liberty, or property without due process of law." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). A valid due process claim has three prerequisites: (1) the deprivation, (2) of a liberty or property interest, (3) by officials acting under color of state law. *Parratt v. Taylor*, 451 U.S. 527, 536-37 (1981). To prevail on a claim of deprivation of liberty without due process of law, a plaintiff must first establish the existence of a protected liberty interest. After meeting this threshold requirement, the plaintiff must then demonstrate that the defendants failed to provide the process due. *See Wolff*, 418 U.S. at 556-57; *Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003).

Liberty interests may arise from the Due Process Clause itself or from state law. *Hewitt v. Helms*, 459 U.S. 460, 466-68 (1983), *abrogated in part on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). The Due Process Clause does not confer a liberty interest in freedom from state action taken "within the normal limits or range of custody which the conviction has authorized the State to impose." *Sandin*, 515 U.S. at 478 (citing *Meachum v. Fano*, 427 U.S. 215, 225 (1976)). Thus, the Supreme Court has found that the Due Process Clause does not afford prisoners a liberty interest in being free from intrastate prison transfers, *Meachum*, 427 U.S. at 225, or in remaining in the general prison population. *Hewitt*, 459 U.S. at 468; *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) ("administrative segregation falls within the terms of confinement ordinarily contemplated by a sentence."). However, in certain circumstances, states may create liberty interests protected by the Due Process Clause. *Sandin*, 515 U.S. at 483-84. For example, in *Sandin*, the Court found that a prisoner may have a liberty interest in avoiding transfer to particular conditions of confinement if the

transfer "imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484; *Wilkinson v. Austin*, 545 U.S. 209, 222 (2005).

Once the court finds a protected liberty interest, the court must then determine what process is due under the Fourteenth Amendment and whether the defendants have provided the process due. *Quick v. Jones*, 754 F.2d 1521, 1523 (9th Cir. 1984). When an inmate is placed in segregated housing, prison officials need only provide an informal, non-adversary review of the evidence justifying the decision to segregate the inmate within a reasonable time. *Hewitt*, 459 U.S. at 476, 476 n. 8. Thereafter, prison officials must periodically review the initial placement. *Id.* at 477, n. 9.

Plaintiff contends that defendants violated his Fourteenth Amendment due process rights by placing him in ad-seg without a timely FCC hearing, and by refusing to explain why they continue to hold him in ad-seg (#14, p. 4; #36, pp. 6-7, 12). Defendants argue that plaintiff's transfer from disciplinary segregation to ad-seg does not implicate a protected liberty interest, as plaintiff received greater privileges in ad-seg (#45, p. 7). Defendants also argue that plaintiff was afforded due process. *Id.*

Plaintiff's case notes indicate that he did not receive any ad-seg reviews between September 2010 and January 2011. However, plaintiff did receive ad-seg reviews on February 16, 2011, March 16, 2011, April 21, 2011, and May 18, 2011—he simply refused to attend these reviews (#45-1, Ex. A, ¶ 24; #45-1, Ex. A-4, p. 25). Defendants also held an FCC hearing for plaintiff on May 20, 2011, during which prison officials advised him that he would not be granted cross-over privileges into Unit 3A due to his past disciplinary history, his removal from HRP status in 2007, and his most recent disciplinary action in 2010 (#45-1, Ex. A, ¶ 25).

Defendant McDaniel states that plaintiff is housed in ad-seg for multiple reasons, but primarily because plaintiff witnessed a murder and subsequently testified against another inmate

(#46, Ex. B, ¶ 8 (*sealed*)). Thereafter, NDOC attempted to obtain an out-of-state transfer to protect plaintiff. *Id.* However, this transfer attempt was unsuccessful. *Id.* Accordingly, plaintiff remains in long-term ad-seg for his own safety and security (#46, Ex. B, ¶ 8 (*sealed*); #45-1, Ex. A, ¶ 20; #45-1, Ex. A-9, pp. 2-3 (an inmate may be placed in ad-seg if he poses a serious threat to life, property, self, staff or other inmates, or to the security of the institution)). Defendant McDaniel also states that even though plaintiff may believe that prison officials placed him in ad-seg and denied his cross-over privileges based on religious discrimination, plaintiff was actually placed in ad-seg to alleviate safety and security concerns (#46, Ex. B, ¶ 12 (*sealed*)).[3] Finally, defendant McDaniel states that plaintiff has met with caseworkers and/or a classification committee on several occasions, where it was explained to him why he was being housed in ad-seg. *Id.* at ¶ 11.

The court finds that there are genuine issues of material fact as to whether plaintiff has a protected liberty interest in his ad-seg classification, and whether defendants' actions satisfied the due process requirements applicable to ad-seg. First, the court recognizes that in and of itself, segregated housing does not implicate a protected liberty interest. *Serrano*, 345 F.3d at 1078; *May*, 109 F.3d at 565; *Sandin*, 515 U.S. at 484. However, an indefinite term of segregated confinement may implicate a protected liberty interest. *See Wilkinson*, 545 U.S. at 224. Further, an inmate may demonstrate that his particular confinement implicates a protected liberty interest by showing that the confinement causes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484.

It is unclear whether plaintiff is subject to "indefinite" ad-seg confinement. It is also unclear whether plaintiff's confinement presents the type of "atypical or significant, deprivation [that] might

---

[3] Defendants submitted an anonymous inmate kite dated November 2009, which states that if plaintiff were permitted to have cross-over privileges "[there] are many of us who will risk a complete lock down of this unit then [sic] to have this low life breather around us . . . your staff could be in danger as well" (#46, Ex. B-1 (*sealed*)).

conceivably create a liberty interest." *Resnick v. Hayes*, 213 F.3d 443, 448 (9th Cir. 2000). Plaintiff has failed to submit any evidence comparing prison conditions in the general CMU population with those in the ad-seg CMU population. Other than plaintiff's allegation that his ad-seg classification prevents him from worshipping with other Muslim inmates, plaintiff has also failed to explain how his confinement in Unit 3B's ad-seg has caused "a major disruption" in his life as a prisoner. *See id*; *Sandin*, 515 U.S. at 486-87.[4] Finally, the court notes that plaintiff was placed in ad-seg after spending 270 days in disciplinary segregation. Thus, when plaintiff was placed in ad-seg he experienced a *less restrictive* prison environment than that to which he had previously been accustomed. *See Sandin*, 515 U.S. at 484 (inmate does not have a liberty interest in preventing transfer to *more restrictive* conditions of confinement, unless the inmate can demonstrate that the transfer caused "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."). Accordingly, the court finds that there are genuine issues of material fact as to whether plaintiff had a protected liberty interest in his ad-seg classification.

Second, even assuming *arguendo* that plaintiff could demonstrate that he has a protected liberty interest in his ad-seg classification, the court finds that there are genuine issues of material fact as to whether defendants' actions satisfied the applicable due process requirements. For example, it is undisputed that defendants failed to provide plaintiff with ad-seg reviews between August 2010 and February 2011. However, the parties dispute whether this delay was reasonable. The parties also dispute whether prison officials ever gave plaintiff an explanation for his ad-seg classification. Plaintiff claims that prison officials never provided any justification for his ad-seg classification (#36, pp. 6, 12), whereas defendant McDaniel declares that plaintiff met with

---

[4] There is no evidence before the court as to whether plaintiff would receive cross-over privileges if he were removed from ad-seg, or whether there are other Muslim inmates in the CMU with whom plaintiff could potentially practice his faith.

caseworkers and/or a classification committee, and that these staff members explained their classification decision (#46, Ex. B, ¶ 11 (*sealed*)).

The court finds that plaintiff has failed to submit authenticated evidence demonstrating the absence of any genuine issue of material fact for trial. Taking the evidence in the light most favorable to the non-moving party, a grant of summary judgment in plaintiff's favor would be inappropriate as to plaintiff's Fourteenth Amendment due process claims.

### 2. First Amendment Retaliation

"A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

Plaintiff alleges that defendants postponed his FCC hearing, continue to confine him in ad-seg, and refuse to grant him cross-over privileges in retaliation for plaintiff's attempts to exercise his religious beliefs (#36, pp. 1-2). Plaintiff also alleges that his ad-seg classification has chilled his ability to engage in group worship with other Muslim inmates. *Id.* at 16. To support these allegations, plaintiff points to an inmate kite dated February 28, 2011, that he allegedly sent to defendant Brooks. The kite reads:

> Are "u" aware that (E.K.) and (R. Baker) has a personal grudge against me. Cuz, I'm a muslim and this is why they've denied me my crossover privileges. Both are childish for their retaliation against me!!! Yes or No please.

(#36, Ex. 14). In the response section, the word "Yes" is written, along with what appears to be defendant Brooks's signature.

Both defendants Baker and Brooks dispute the authenticity of this inmate kite. Defendant Baker states that when she reviewed plaintiff's institutional file, she located two inmate kites dated February 28, 2011 (#45-1, Ex. A, ¶¶ 28-29). In the first kite, plaintiff asked defendant Brooks whether defendant McDaniel was still ESP's warden, to which defendant Brooks apparently responded "Yes" and signed her name (#45-1, Ex. A, ¶ 28; #45-1, Ex. A-7, p. 37). In the second kite, plaintiff asked defendant Brooks if defendants McDaniel and Baker held a "personal grudge" against him (as indicated above), to which defendant Brooks allegedly responded "Yes" and signed her name (#45-1, Ex. A, ¶ 29; #45-1, Ex. A-7, p. 38). Defendant Baker opines that this second kite is likely a forgery, as it was not part of plaintiff's institutional file, but was attached to one of plaintiff's grievances. Defendant Brooks' alleged response and signature are also similar and in identical locations on both inmate kites (#45-1, Ex. A, ¶¶ 29-30; #45-1, Ex. A-8, p. 40).

Defendant Brooks states that she does not remember either of plaintiff's February 28, 2011, inmate kites, but that both responses and signatures appear to be in her handwriting (#45-1, Ex. C, ¶ 6). Defendant Brooks does not believe that plaintiff's second kite is authentic, and states that she would not have responded "Yes" to the second kite, as she had no knowledge whether defendants McDaniel or Baker held a "personal grudge" against plaintiff. *Id.* at ¶ 9. Finally, defendant Brooks states that plaintiff's second kite seeks a response to what appears to be an argumentative, harassing and baseless question. *Id.* at ¶ 11. Had she actually received this kite, she would have advised plaintiff to proceed through NDOC's grievance process if he felt that he was being retaliated against by ESP staff. *Id.* at ¶¶ 11, 13.

The court finds that even if plaintiff could prove that the disputed inmate kite is genuine, this evidence does little to advance his retaliation claim. First, the response to the kite is ambiguous. Second, whether defendant Brooks believed that defendants McDaniel and Baker held a "personal grudge" against plaintiff, although relevant, does not prove that defendants McDaniel and Baker actually had any animus towards Muslim inmates or that they confined plaintiff in ad-seg because he wished to engaged in group worship with other Muslim inmates. Defendants McDaniel and Baker both state that they do not have a "personal grudge" against Muslim inmates, and that they permit all inmates to practice their faiths pursuant to prison regulations and procedures (#46, Ex. B, ¶ 14; #45-1, Ex. A, ¶ 31). Further, although plaintiff claims that defendants refused to release him from ad-seg and refused to grant his cross-over privileges in retaliation for his protected religious activity, defendants McDaniel and Baker state that plaintiff was placed in ad-seg for his own protection—not because he is a Muslim inmate (#46, Ex. B, ¶¶ 12, 14; #45-1, Ex. A, ¶ 31).

It appears that there are genuine issues of material fact as to defendants' motive for confining plaintiff in ad-seg. It also appears that there are genuine issues of material fact as to whether defendants' decision to continue plaintiff's ad-seg confinement and deny his cross-over privileges was done for a legitimate penological purpose. Accordingly, the court recommends that plaintiff's motion for summary judgment be denied as to his First Amendment retaliation claim.

### 3. First Amendment Free Exercise of Religion

Convicted prisoners do not lose their First Amendment right to freely exercise their religion by virtue of their incarceration. *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972). However, "lawful incarceration brings about the necessary withdrawl or limitation of many privileges and rights . . . ." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)). A prisoner's right to freely exercise his or her religion is necessarily limited by

incarceration, and may be curtailed to achieve legitimate correctional goals or to maintain prison security. *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam).

To merit protection under the Free Exercise Clause, a prisoner's religious claim must satisfy two basic criteria. *Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir. 1981). First, the prisoner's proffered belief must be "sincerely held." *Id.* Second, the claim must be "rooted in religious belief"—not in "purely secular" philosophical concerns. *Id.; see Shakur v. Schriro*, 514 F.3d 878, 885 (9th Cir. 2008) (sincerity test set forth in *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994) and *Callahan*, 658 F.2d at 683, determines the applicability of the Free Exercise Clause).

Even if a prison regulation impinges on an inmate's constitutional rights, the regulation is nevertheless valid if it is reasonably related to legitimate penological interests. *Shakur*, 514 F.3d at 883-84 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). Under *Turner*, the court must balance four factors to determine whether a prison regulation is reasonably related to legitimate penological interests: (1) whether there is a "valid, rational connection" between the prison regulation and the legitimate governmental interests put forward to justify the regulation; (2) whether prisoners retain "alternative means of exercising the right" at issue; (3) the impact the requested accommodation will have upon inmates, prison staff and the allocation of prison resources generally; and (4) whether there are easy alternatives to the regulation which could be implemented at a minimal cost to legitimate penological interests. *See Shaw v. Murphy*, 532 U.S. 223, 229 (2001); *Turner*, 482 U.S. at 89-91. In evaluating a free exercise claim, courts must give appropriate deference to prison officials, *O'Lone*, 482 U.S. at 349, because "the judiciary is 'ill-equipped' to deal with the difficult and delicate problems of prison management." *Thornburgh v. Abbot*, 490 U.S. 401, 407-08 (1989) (citation omitted).

Plaintiff alleges that defendants McDaniel and Baker violated his First Amendment right to freely exercise his religion by confining him in ad-seg, which prohibited him from engaging in group worship with other inmates (#36, p. 15). Defendants argue that there are substantial issues of fact related to plaintiff's First Amendment claims, which preclude a grant of summary judgment in plaintiff's favor (#45, pp. 9-11).

Defendants have submitted ESP's Institutional Procedure 8.05, which states that inmates are permitted to exercise religious activities within their assigned cells, as long as the activities are within legal and procedural guidelines (#45-1, Ex. A, ¶ 32). Defendants McDaniel and Baker both state that they do not bear any type of "grudge" against Muslim inmates and allow all inmates to practice their faiths in a manner consistent with prison rules and regulations (#45-1, Ex. A, ¶ 31; #46, Ex. B, ¶ 14). Defendants have also submitted a partial transcript from plaintiff's deposition, in which plaintiff testified that he converted to the Islamic faith in 1991 (#45-1, Ex. D, pp. 127-28). Plaintiff testified that he does not require any special item to practice his faith, but owns several Qurans, a prayer rug, kufis, and Islamic reading material. Plaintiff also admitted that he can practice his religion by himself. *Id.* at 138, 141, 143.

The court finds that plaintiff has failed to submit any evidence to support several elements of his First Amendment free exercise claim. Plaintiff has produced no evidence that he sincerely believes he must engage in group worship to satisfy the tenants of his Islamic faith. Plaintiff has also produced no evidence that his alleged need for group worship is "rooted in religious belief"—not in "purely secular" philosophical concerns. *Callahan*, 658 F.2d at 683. Finally, plaintiff has produced no evidence that defendants' decision to confine him in ad-seg was not reasonably related to the prison's legitimate penological interests. On the contrary, the record indicates that plaintiff was placed in ad-seg for safety and security reasons unrelated to religious discrimination. In short,

plaintiff has failed to produce any evidence or argument supporting his First Amendment free exercise claim. Accordingly, the court recommends that plaintiff's motion for summary judgment be denied as to his First Amendment free exercise claim.

### 4. Fourteenth Amendment Equal Protection

The Equal Protection Clause of the Fourteenth Amendment requires the State to treat all similarly situated people equally. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). Under the Equal Protection Clause, prisoners are protected from invidious discrimination based on race, *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974), and religion. *See Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997), *abrogated on other grounds by Shakur*, 514 F.3d at 884-85. To establish a violation of the Equal Protection Clause, a plaintiff must show that prison officials intentionally discriminated against him on the basis of his religion by failing to provide him with a reasonable opportunity to pursue his faith compared to other similarly situated religious groups. *Cruz v. Beto*, 405 U.S. 319, 321-22 (1972); *Shakur*, 514 F.3d at 891; *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003), *cert. denied*, 543 U.S. 825 (2004). Once the plaintiff makes this prima facie showing, the court must apply the *Turner* factors. *See Shakur*, 514 F.3d at 891; *see also Walker v. Gomez*, 370 F.3d 969, 974 (9th Cir. 2004) (citations omitted) ("In the prison context, however, even fundamental rights such as the right to equal protection are judged by a standard of reasonableness—specifically, whether the actions of prison officials are 'reasonably related to legitimate penological interests.'").

To begin, a plaintiff must submit authenticated evidence indicating that he was not afforded a reasonable opportunity to pursue his faith as compared to prisoners of other faiths, and that "officials intentionally acted in a discriminatory manner." *Freeman*, 125 F.3d at 737. "Intentional

discrimination means that a defendant acted at least in part because of a plaintiff's protected status." *Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994).

Here, plaintiff has entirely failed to proffer any evidence or even argument supporting his Fourteenth Amendment equal protection claim. Although plaintiff alleges that defendants confined him in ad-seg because he is a practicing Muslim, plaintiff has made no attempt to compare his situation to that of other CMU inmates practicing non-Muslim religions. Other than the disputed inmate kite discussed above, plaintiff has also failed to submit any evidence showing that defendants intentionally discriminated against him for practicing his Islamic faith. Defendants assert that plaintiff is confined in ad-seg for secular safety and security reasons (#46, Ex. B, ¶ 12). Thus, it appears that whether defendants confined plaintiff in ad-seg and denied his cross-over privileges with an intent to discriminate against him for practicing his Islamic faith is, at best, a disputed issue of material fact. Having failed to make out a prima facie case of intentional discrimination, plaintiff is not entitled to summary judgment on his Fourteenth Amendment equal protection claim.

### III. CONCLUSION

Based on the foregoing, and for good cause appearing, the court concludes that plaintiff has failed to submit authenticated evidence demonstrating the absence of any genuine issue of material fact for trial. The parties are advised:

1. Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. This Report and Recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

### IV.  RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that plaintiff's motion for summary judgment (#36) be **DENIED**.

**DATED:** July 22, 2013.

_____
UNITED STATES MAGISTRATE JUDGE